UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:

RONALD G. WISE, JR. and AMANDA
WISE, his wife,

        Plaintiffs,

vs.

UNITED TECHNOLOGIES CORPORATION
PRATT & WHITNEY GROUP, a Connecticut
corporation, and PALM BEACH
AGGREGATES, LLC, a Florida entity,

        Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, RONALD G. WISE, JR., and AMANDA WISE, his Wife, sue Defendants UNITED TECHNOLOGIES CORPORATION Pratt & Whitney Group, a Connecticut corporation, and PALM BEACH AGGREGATES, LLC, a Florida Corporation, for damages as prayed for specifically below.

## JURISDICTION and VENUE

      1.    This action is filed pursuant to 42 USC 2210(n)(2) and 42 USC 2014(h)(h).

      2.    Ronald G. Wise Jr. is a brain tumor survivor; his tumor was caused by the Defendants releases of radioactive materials, heavy metals and semi-volatiles in the Acreage. This Court has original jurisdiction over the allegations related to a nuclear incident as defined in 42 USC 2014 and pendant jurisdiction over the related exposure claims.

      3.    Plaintiffs, RONALD G. WISE, JR. and AMANDA WISE, live in Palm Beach County Florida.   They have resided together at a home owned by Ronald Wise's mother located at 57th Place North, West Palm Beach, Florida.

4.      Ronald Wise Jr. has lived on the property on at least a part-time basis since his father bought the property in 1973.

5.      Defendant PRATT & WHITNEY is a division of UNITED TECHNOLOGIES CORPORATION, a Connecticut corporation that possesses, maintains, and runs an engineering facility in northwest Palm Beach County adjacent to the Corbett Wildlife area.  (Hereinafter "Pratt Whitney")

6.      Defendant PALM BEACH AGGREGATES, LLC is a Florida entity operating mining and associated interests and owning land in Palm Beach County.   (Hereinafter "Aggregates").  Aggregates owned, and then for some time leased, the land that is currently used as an aquifer impoundment by the South Florida Water Management District - the L8 reservoir.

## RONALD WISE'S DIAGNOSIS

7.      Plaintiff, RONALD G. WISE, JR., (hereinafter "Ronald") has lived in the area known as The Acreage originally since 1979 on 57th Place North, West Palm Beach, Florida.

8.      As a child he lived, played, hunted and fished on the property and the surrounding areas since his birth.

9.      His parents bought the property in 1973 and until 1979 they camped on the property over weekends, relying on the canals and well water.

10.     They lived on the property full-time shortly thereafter.

11.     Ronald's older sister was diagnosed with Leukemia within three years of those camping trips and died two years after moving onto the property full time.

12.     Both he and his sister had been eating the fish, vegetables, and livestock raised on the property and fished from the Corbett Wildlife Management area since 1974.

13.    In September of 2007 Ronald was admitted to Palms West Hospital with the initial diagnosis of cellulitis to the neck - which was drained.

14.    A subsequent MRI in September of 2007 revealed that Ronald had polyposis with soft tissue opacification; nasal polyps and mucous retention cyst.    A Schneiderian papilloma was removed from his right ethmoid cavity and continued to reoccur. This was partially removed in March of 2008.

15.    It was discovered that a sub-cranial tumor in fact fractured his skull, allowing it to transgress the nasal cavity rather than proceeding into the brain.  He was ultimately diagnosed with an intranasal meningioma.

16.    In April of 2008, Ronald underwent surgery for the removal of the intranasal meningioma.

17.    Ronald has subsequently undergone nine surgeries and suffered through those recoveries that at times have been complicated with acute bacterial sinusitis.  This was the beginning of multiple nasal/sinus surgeries.  Ronald's April 2008 surgery was followed with a course of radiation therapy.

18.    The tumor and the required medical measures have caused RONALD WISE, JR. significant damages in the past including economic and non-economic damages.

19.    The seizure disorder caused by the tumor and the continuing damage it causes and the required medical measures will cause RONALD WISE to incur significant damages in the future including economic and non-economic damages.  Said damages are permanent and continuing in nature.

20.    The loss of her husband's services have likewise caused on-going economic and non-economic damages to AMANDA WISE.

3

**The Brain Tumor Cancer Cluster**

21.     In 2009, the Department of Health (DOH) declared that the level of pediatric brain tumors diagnosed in the Acreage was significantly escalated for the years 2005-2007.

22.     In 2010, the Center for Disease Control (CDC) confirmed the escalation and the 2008 pediatric diagnoses were added to the cluster.

23.     "The Acreage" area as designated by that report is a well-water reliant community in the center of the L8 basin, which is influenced by the surface and groundwater at the Pratt Whitney campus from the North and by the L8 reservoir structure built by the Aggregates upon the cessation of its quarry operations in certain rock pits.

24.     The report, attached as Exhibit "A", compared the number of cancers diagnosed in the Acreage (the observed incidence) with the population-weighted number of cancers diagnosed in the County and the State (the expected cancer incidence.)  The August 2008 report stated that cancer was generally elevated throughout the Acreage and that pediatric brain tumors were significantly elevated to a level of more than three times the expected rate of occurrence.

25.     Charts within the DOH report that the brain cancer incidence among the entire Acreage population as a whole was sharply rising, whereas that same trend was not occurring in the county or the state.

26.     The plaintiff is not related to any of the pediatric cases included in the designated cluster; however he is among a growing number of adults who have been diagnoses with giomas or other related disorders in the head and neck.

27.     The cancer cluster designation was based only on pediatric brain tumors.  The state stopped looking at diagnoses of brain tumors made in adults in 2007, although it appeared

4

in the report that the entire population of the Acreage was experiencing a steady, sharp increase of cases.

28.     According to self-reported data from the community, the 2008-2010 incidences of brain tumors for the entire Acreage population is above 30.   From 1997-2007, the highest number of cases that should be expected in any three year period based on both state and county comparisons is 5.1.  Based on the self-reported data the pediatric cancer cluster declared by the State for the years 2004-2008 would be expanded to a general brain cancer cluster from 2004-2010.

29.     The fact is that brain cancers are significantly escalated in the Acreage.

30.     The study notes that ionizing radiation is the primary environmental contaminant associated with an increased incidence of brain tumors.

31.     Other studies have detected the presence of heavy metals including lead and cadmium in brain tumor tissue.

**Failed State Study: Concern regarding Property Values**

32.      When the cancer cluster was declared in 2009, property values in the Acreage declined in direct response to the declaration.

33.     They continued to decline after the Department of Health investigation ceased without finding a cause of the cluster and despite the baseless assertion by the Department of Environmental Protection that that the "Acreage is a safe place to live and no risk factors were found associated to pediatric brain cancer."

34.     At the same time that the Department of Health (DOH) and the Department of Environmental Protection (DEP) announced this failure to find any source of the increased incidence of pediatric brain tumors, the agencies also promised to do the following:   "Our

epidemiologists will continue to monitor cancer rates in the area for any indication that another increase is occurring. In the meantime, the Department of Health will continue to work with the families whose children have been affected by cancer."

35.     This     information     remains     published     on     the     web     at http://www.pbchd.com/pdfs/newsletters/acreage_update/the_acreage_neighborhood_update-11-05-2010.pdf.

36.     Since that statement was released in November 2010, there has been no publication of the numbers of brain tumors diagnosed amongst adults.   The agencies have refused to communicate with the families whose children have been affected by cancer or their counsel; in fact, the Department of Health has ignored requests for insight on testing that has been performed since that time—testing the families requested that the DOH do but refused to do.

37.     The failed state study into the cause has not diminished or nullified the value loss caused by the pollution described herein; but the premature conclusion was clearly based on the desire to mitigate that damage rather than on any sound methodology.

**FAILED STATE STUDY:  Incomplete Data**

38.     Despite the fact that the "primary environmental contaminant" associated with brain tumors etymology is ionizing radiation, neither Department ever performed any testing of the residential water aquifer for gamma emitting radioactive materials.

39.     The DEP tested the water at the case and control homes only one time including a sampling survey of 59 private wells in August; in that survey it noted an elevated level of gross alpha radiation at several homes—an indication that more specific testing for gamma

radionuclides should be done.  Radioactive materials can emit either alpha, beta, or gamma radiation.  Gamma radiation is the most dangerous.

40.     The fact sheet released described above in paragraph 33-35 incorrectly stated that "After testing the groundwater, soil and gamma radiation levels in the Acreage Study area, the investigation affirmed that the community is safe for residents and visitors."  In fact, neither the groundwater nor the surface water was ever tested by any state agency for the presence of gamma emitting radionuclides.  The lone gamma radiation spectroscopy done on groundwater within the Acreage has been performed by the various parties in this lawsuit and completely ignored by the state agency.

41.     Neither Department ever performed any testing of any sort on the surface waters that recharge the surficial aquifer in the L8 basin, which charges the Acreage surficial aquifer.

42.     The one-time testing of the water sources at the case homes (referred to in paragraph 39 above) revealed the presence of some heavy metals but neither department ever did any testing to determine where those metals came from so there was no way for them to rule out whether those low levels in fact exceeded regulatory levels at times prior to August 2009 (when the victims would have been exposed) and no way for them to determine if the levels would again increase.

43.     Certain volatile organic compounds including benzopyrene and metals including arsenic were found in levels that exceeded the Department of Environmental Protection's regulated target levels for residential soil clean-up at a number of the soil samples collected at the case homes.

44.     Residents were advised that although these levels exceeded clean-up standards, that neither department could offer guidance as to how to clean-up of the materials because they had not endeavored to find the source.

45.     The Plaintiffs' counsel in fact did test the water for gamma emitting radionuclides and sent them to the DOH as explained below, but the Department of Health Bureau of Radiation Control has no record of assessing either those test results or the soil sampling for gamma products that was performed by the DEP and a contract lab.

## FAILED STATE STUDY: Failure to Assess Local Polluters

46.     Both Defendants have conducted operations which various state agencies were aware had released contaminants into the L8 basin, including the types of contaminants found within the state's investigation and the types associated with brain tumors and including the metals found by the DEP in the Acreage water.

47.     The South Florida Water Management District (SFWMD) had noted and curtailed operations of the L8 reservoir, which was constructed by the Palm Beach Aggregates out of the Aggregates' former rock pits due to known concerns about increases in gross alpha radiation.

48.     The increases were caused by the Aggregates' dredging operations.

49.     Pratt Whitney has released and attempted to remediate releases of radioactive materials, heavy metals and volatile organic pollutants at forty-seven (47) sites in its campus.

50.     Financial Statements for United Technologies have stated that the company has identified 710 sites throughout the world for which the Defendant may have had some liability for damages caused by environmental contamination.  Of those, it has resolved for the liability for 322; the Palm Beach County Campus is not one of those sites for which Pratt Whitney has resolved liability.

8

51.     Pratt Whitney has been obligated to institute "corrective measures" at forty-seven known unit-sites on its Palm Beach County campus, which spans over five miles across the top of the L8 Basin in a triangular shape measuring three miles from the heart of the Corbett Wildlife management area to Beeline Highway, three miles down to the South east along beeline highway and then proceeding for over two (2) miles to the point of origin in the Corbett Wildlife Management Area.  Its total land mass area includes over 7000 acres.

52.     The Corbett Wildlife Management Area then spans over five (5) miles between the Acreage and the Pratt Whitney campus main canal; the area is a large swamp-based wilderness area that drains to the L8 basin water structures including the Acreage ITID impoundment, the Acreage canals structures, and the L8 reservoir.

53.     In at least one instance the Department of Environmental Protection was aware that Pratt Whitney had neglected several drums of potentially hazardous materials in the Corbett area, which was reported by Corbett Wildlife Management Area to the DEP.

54.     Because of concerns that the community had regarding Pratt Whitney's history of regulated clean-up, the study issued a fact report regarding Pratt Whitney from the Department of Environmental Protection.

55.     The fact sheet noted that Pratt Whitney is six (6) miles away from the Acreage and contains 47 known sites which have been subject to corrective action.  It lists the contaminants which continue to be monitored as part of the cleanup process, which include several associated with brain tumors including the heavy metals and semi-volatiles found in the Department of Health's investigation.

56.     The report sheet noted that "While there has been increased interest in the cleanup of contamination at this site in Palm Beach County, DEP does not see any direct relationship between this site and The Acreage which is over five miles away."

57.     That fact sheet fails to note that the investigation and clean-up performed by Pratt Whitney has been the subject of criticism by groups including but not limited to those whose reviews were in fact sought out by the DEP when reviewing Pratt Whitney's preferred risk assessments including The University of Florida's Center for Environmental and Human Toxicology as well as the United States Department of The Interior's Geological Survey (USGS).

58.     The flaws noted by those reviewers and by the Environmental Protection Agency include those aspects of the RCRA investigation that were relied upon in the DEP's summary "all clear" fact sheet release regarding Pratt Whitney's possible relation to the Acreage study.

59.     Other than citing to the fact that it has monitored the clean-up of the site performed by Pratt Whitney and noting the distance of the site from the community, there was no other attempt to allay concerns about the site.

60.     The fact sheet fails to note remediation of nuclear materials performed by Pratt Whitney after some years of illegal mixed-media dumping and does not list the radionuclides which were cleaned up in its list of known contaminants.

61.     In fact, the Department of Health was aware that in 1986, certain uranium nuclides were detected in groundwater test wells located in a metal scrap yard where Pratt Whitney illegally disposed of thoriated scrap metal.   The concern was that these levels, under forty pcu/L, were far and above the levels for other nearby test wells.

62.     In 1986, this concern was cursorily addressed by the statement that these radionuclides could not be present as a result of the known thoriated-nickel scrap dumping because the particular decay products were unassociated with that particular product known to be illegally discarded.

63.     It was determined that the increased uranium in the test wells must be attributed to natural background levels—background levels that somehow escaped the nearby comparable wells referenced in the initial assessment of the concern.

64.     The likelihood that some other materials in addition to the thoriated-scrap metal had been abandoned to the elements and the flooded scrapyard was ignored by the Department of Health's Radiation Bureau in 1986.

65.     The elevated uranium levels in Pratt Whitney test wells was also not re-assessed in 2013 when these families presented the DOH with test results including that uranium was being detected in their wells at small amounts while gamma emitting thorium decay products were being found in the THOUSANDS of picocuries per liter in their residential water supply.

66.     In fact, until Pratt Whitney afforded its license-numbers in the remand briefing in this case, the fact that uranium levels of concern were ever detected at Pratt Whitney and communicated to the Department of Health was not disclosed by the Department of Health.

67.     The failure to address that clean-up within the state's investigation is particularly abhorrent because within the extremely limited amount of testing done by the investigation, the Department of Environmental protection noted an increased presence of gross alpha radiation at certain case homes.

## FAILED STATE STUDY: Biased Influence:
## Unwillingness to find an imminent hazard

68.     The Acreage is part of an unincorporated area of Palm Beach County zoned for mixed use including residential dwelling wherein building permits have been issued and the area is reliant upon well water.

69.     As such, the areas roads, drainage and other such structures are maintained by an improvement district referred to as the Indian Trail Improvement District.

70.     Due to the circumstances described above in paragraph 68, if an "imminent health hazard" were to be determined to exist as a result of the community's reliance on well water, the County would be obligated first to subsidize the provision of treated water for the community and to then investigate any potential responsible party in order to provide recovery of such funds.

71.     Although the Palm Beach County Water District had just completed implementing a water main from the south of the Acreage up to a Mecca Farms distribution pump-house site through the Acreage community thoroughfare (Seminole-Pratt Whitney Road), the County would have faced eight hundred millions ($800,000,000.00) in costs if it had to incorporate the community by residential hook-up lines.  It had reason to determine that cost in the past.

72.     The Acreage community allowed for the building of that water line, though it remains unusable by most residents because there are no residential lines.

73.     By 2009, Palm Beach County was well aware that the water well field that had been used by Pratt Whitney since 1960 and then abandoned, was not viable because the County abandoned negotiations to purchase the well fields and existing utility structure when numerous environmental site assessments informed the County that the parcel was too tainted and the wells too at risk for contamination from both regulated and unregulated existing hazards.

74.     In fact, by 2006, the County received millions of dollars from the Beeline Community Development District, funded by Pratt Whitney, in order to hook the plant and property up to the Mecca distribution site.

75.     In 2005, the County agreed to provide clean, county treated potable water to the schools and parks in the Acreage.

76.     In 2005, the neighboring Village of Royal Palm Beach also agreed to be hooked up to County water, an agreement through which they abandoned their water wells (which had tapped the same L8 basin aquifer that the Acreage, the Aggregates, Corbett, and Pratt Whitney all once shared.) The County declined the opportunity to purchase that well field.

77.     Essentially, by the 2010 Cancer Cluster designation, the lone communities that would continue to rely on the aquifer within the L8 basin were the Acreage (with individual wells reliant residences) Loxahatchee Groves (with individual wells reliant residences) and Seminole Water Control District, which treated water from its own well field for use in agricultural settings.

78.     The Seminole water treatment plant included reverse osmosis to remove radionuclides.

## FAILED STATE STUDY: Biased Influence

79.     Michelle Damone and county officials determined to create a community based task force that would communicate on behalf of the Acreage with the State agencies as they investigated the cluster.

80.     From the onset, it appears that Damone was intent upon influencing the government agencies to rescind the cluster designation.

81.     Originally termed the "Governor's Task Force" the board was to include people hand-picked by Damone to speak with the state agencies on behalf of the community.  When faced with criticism or question regarding her decision to cherry-pick group members, her response was "I just don't care.  This is a serious issue."  She formally refused to invite any guest speaker associated with "the Erin Brokavich law firm" because they may have been biased and announced that she would be certain all persons would be vetted and backgrounds disclosed.

82.     Prior to that time, the individual's speaking with the state agencies were the families whose children that had brain tumors and their law firms, including as it happens the law firm associated with Erin Brokavich and this law firm.

83.     Damone's original selection of board members included the following: one parent of a pediatric cluster victim, one former Pratt Whitney engineer, several realtors, a legal assistant of unknown affiliation, and the environmental consulting engineer of an incoming developer.

84.     The former Pratt Whitney Engineer, Andrew Narcus, doggedly pursued Damone to get the group started and requested particularly that she tell the governor's office, with whom she was setting up the task force, that he had a lot of insight on Pratt Whitney.

85.     The Governor's office, through the head of the Department of Health operating under then governor Charlie Christ, insisted that Damone appoint additional families to the board and advised that if the board were to be termed the "governor's task force" the board would be required to go through disclosure, including provisions of Florida's Sunshine laws, which would make all communications of the group members public records and might require election and/or ratification.

86.     Pratt Whitney deliberately influenced the premature and inconclusive conclusion of the state investigation through Narcus, who orchestrated and sat on the Acreage Focus Group

for months without revealing his work history to the group until it was uncovered by a member of the community who posted Pratt Whitney owned turbine related patents that listed him as inventor.

87.     Damone, who at that time appears to only have been communicating with Andrew Narcus and County officials about her conversations with Tallahassee, determined to label the group the Acreage Focus Group and circumvented election and disclosure.

88.     She did ask two separate parents to be group members, Tracy Newfield and William "Bill" Featherston.

89.     Before the first meeting, Andrew Narcus and Damone devised a mission statement to set the group on its start; this was done through emails not disclosed with the group. When asked by a board member whether emails would be subject to Sunshine laws, Damone replied "No, that's the beauty of a focus group."

90.     Narcus never disclosed his Pratt Whitney background to the group members at large until it was discovered several months after this first meeting by an individual not associated with the Focus Group who notified the group members via internet postings.  He only announced himself as a professional engineer who "does root-cause analysis for a living."

91.     By the time the former Pratt Whitney engineer conceded that he was a prior employee of the company, the company and its contamination had been the subject of several meetings, discussions through which the engineer never disclosed his prior employment.

92.     At a presentation by the DEP and the DOH, the subject of Pratt Whitney contaminants was addressed.  At that meeting, board members asked what types of fuel were used and why some of the contaminants listed in the fact sheet were not tested for at the residences tested in the DEP's one-time water survey.

93.     Narcus said nothing about his experience and afforded no insight.

94.     At a subsequent meeting in May, Narcus circulated a draft consensus statement stating that the community board was of the opinion that the one round of testing done by the Department of Environmental Protection sufficiently showed that the water was clean and safe, even though continued tests on the soil were still awaiting conclusion.

95.     This particularly contradicted his statements at the first meeting, before he was elected chair, wherein he stated he thought more than one round of testing was required as the community water was subject to seasonal and day-to-day influences.

96.     In response, other members raised concerns about the summary conclusion statement as they had never been included on any draft of the statement.

97.     These other members also stated concerns about the sufficiency of the testing and the lack of DEP disclosure regarding Pratt Whitney and particularly information they had just uncovered about the failed Palm Beach County Water Utilities district deal.

98.     Again, Narcus said nothing about his experience and afforded no insight but agreed that the issue perhaps should be addressed before the summary "all clear" was released.

99.     In subsequent meetings, agency personnel came in to discuss water flow and again, Pratt Whitney's influence on the aquifer was the subject of discourse.

100.    Again, Narcus said nothing.

101.    As Chair of the Focus Group, Narcus received an email from one fellow member, Patricia Curry, the "legal assistant" who at the first meeting stated that she did not believe that an environmental cause existed.  It was copied to all members and included a summary of Pratt Whitney concerns at that time as well as a follow up question:   "I realize some might find it tiresome to continue discussing P&W and that property's history, but since there are those who

are sure, or fairly sure P&W is the source/cause of our "female pediatric brain cancer cluster", and as a class action lawsuit, as well as an individual lawsuit (alleging it caused a different sort of cancer), have been filed with these allegations, it leaves the rest of our community questioning whether there is a direct correlation."

102.    The response from South Florida Water Management did not rule out Pratt Whitney, as was hypothecated by Curry's request. Instead, it left her realizing that it could take Pratt contaminants less than ten years to travel via groundwater alone—she had assumed prior to asking for data that the rumor that Pratt was "100 years away" to be true.

103.    None of her comments shared with Narcus about the SFWMD data or the comments of the Vice Chair were circulated to the group as Narcus noted to Ms. Curry that circulating those comments "would be bad for me."

104.    Although Narcus's employment was apparently known by Curry, Damone and perhaps the vice chair Mike Nichols, it was never in fact disclosed to the group until it was posted by a woman named Kathy Butler.

105.    After his prior employment was disclosed, Andrew Narcus sent out an email stating that he had worked at Pratt in the past and if he would have any concerns about the campus, it would be the western portion of the property.

106.    Later, Narcus resigned because of personal concerns about being the sudden subject of on-line criticisms by non-board member Kathy Butler, the woman who posted his patents.

107.    The Focus Group disbanded when several members resigned because of concerns about the Pratt Whitney's engineer's influence.

108.    The Focus Group originator, Damone, announced to the press that the group disbanded because the group felt the state answered concerns about environmental safety and the fact statement noted in paragraph 40 above was issued by the state agencies.

**FAILED STATE STUDY:  Ignored Data**

109.    In 2013, after learning the identity of a portion of the particular radionuclides that Pratt Whitney had been licensed by the Department of Health to use, the families still living in the Acreage tested their well-drawn water for the presence of those materials as well as water control structures.

110.    In addition to increased levels of decay products of thorium (which could be the result of either the TE-NORM pollution caused by the Aggregates as alleged below or the thorium used by Pratt Whitney as described below), the families detected the presence of non-naturally occurring materials.

111.    These test results were sent to the Department of Health including to the Bureau of Radiation Control, to whom the Plaintiffs had been directed by the Nuclear Regulatory Association upon receipt of the results; and to the Epidemiologists within the DOH who had been conducting the cluster study (the person to whom the Department had previously directed the families to communicate their concerns).

112.    The lone response was a direction from the Department of Health's general counsel requesting that all communications regarding the Acreage issues be sent to Counsels' office only and that the families retain independent experts to interpret the results.  In other words, the DOH restricted the families' ability to speak with any DOH person excluding its counsel.

113.     DOH counsel believed that Sharon Watkins, the epidemiologist, in fact was a member of radiation control.

114.     Although the complete test results and subsequent test results have been sent to the Department of Health counsel for forwarding to DOH officials, there has been no internal communication or review of those tests within the Department and no response from the counsel.

In fact, DOH Bureau of Radiation Protection and Control has no record of the Plaintiff's results or event any correspondence about its own soil testing.

115.     In other words, while the Department of Health declared the brain tumor cluster, a cluster most primarily associated with exposure to ionizing radiation, it utterly failed to conduct any meaningful study or to assess the two sources who have been subject to consent orders and/or corrective actions related to releases of those materials found in the Acreage that are related to brain tumor etymology.

## RADIATION IN THE ACREAGE GENERALLY

116.     It is generally accepted by nearly all branches of medicine and particularly by epidemiologists, radio-oncologists, health physicists, and neurologists that exposure to ionizing radiation can cause a brain tumor and will significantly increase an individual's risk for developing a brain tumor.

117.     It is generally accepted within the field of neurology that exposure to cadmium, lead, and mercury or any metal capable of passing the blood brain barrier is a neurotoxin capable of causing a brain tumor.

118.     Two types of ionizing radiation, including gamma and/or beta emitting radionuclides, have been detected throughout the Acreage: naturally occurring and non-naturally occurring.  Note, "naturally occurring" does not mean naturally present—only that it is neither

the use of a nuclear reactor or a particle accelerator required to cause the isotope to be in existence.

119.    Those radionuclides that have been detected in the Acreage at above natural background rates but may be termed naturally *occurring* include Uranium-234, Uranium-235 Uranium-236, and elevated levels of the decay products of Thorium, particularly Lead-214 and Bismuth-214 and Actinium-228.  Naturally Ocurring Materials in rock deposits of radium are referred to as Naturally Occurring Radioactive Material (or NORM.)   The *presence* of technologically enhanced concentrations of NORM products (or TE-NORMS) in water systems can be associated with the metal processing industry, particularly airplane engine and turbine manufacturing; however, high concentrations of these radionuclides in an environment are more readily associated with mining operations, including the type of shell rock mining conducted by the Aggregates.

120.    In addition to the TE-NORM products identified in 119 above, radionuclides have been detected in the Acreage that are not naturally occurring.   These include Cesium-137, Iridium-192, and Cadmium-109.    Contamination of Iridium-191 and Cadmium-109 is particularly associated with the metal processing industry generally and with airplane engine and turbine manufacturing and testing of the type conducted by Pratt Whitney at its Palm Beach Facility.

121.    Additional testing has shown that these radioactive metals are not completely absorbed by the sediment filters used by the residences and that some build-up occurs in the pipes of these residences when significant rains increase the presence of radionuclides in the water.

122.     Both these types of radionuclides (TE-NORM and the industrial, non-naturally occurring material) have been detected in the groundwater and in the surface water structures moving water through the canals that recharge the surficial aquifer from which the Acreage residents source their drinking, bathing, and irrigation water.

## SEMI-VOLATILES AND METALS IN THE ACREAGE GENERALLY

123.     The Department of Health's soil study revealed that benzopyrene was elevated at several case homes.  The same study and private testing found certain heavy metals including barium, lead, cadmium and arsenic in the water and in the soil at some case homes.

## INVESTIGATION BY CLUSTER FAMILIES AND RADIONUCLIDES DETECTED

124.    The levels of radionuclides found at case homes in 2013 greatly exceed the Maximum Contaminant Level (MCL) for alpha emitters set for drinking water by the Environmental Protection Agency of 15 picocuries per liter (pci/L.)  The EPA set that standard because ingestion of alpha radiation over time can cause cancer.

125.    The radionuclides found within the Acreage include gamma and beta emitters, which do not have to be ingested to cause cancer.  The MCL for beta was 15 pci/L prior to the EPA recalibrating the level to a maximum for beta activity at 4 millirems per year.

126.    The MCL for radium, an alpha producing NORM product, is 5pcil/L.  The level for radium is set lower than for alpha emitters generally because it will degrade into radon, lead-214, and bismuth-214 (beta and low level gamma emitters) within a relatively short period.

127.    The resulting exposure exceeds the dose maximums for the public as set forth by 10 CFR § 20.1301 and explained below regarding Pratt Whitney liability.

128.   Testing in 2013 detected elevated levels of lead-214 in water sourced from the Newfield and DeCarlo well and the homes of other adult cancer victims. It was detected  at 1088 ± 123 pci/L at the Newfield home.  It was detected at the DeCarlo home at  266±34.7pci/L.

129.   This trend continued in the testing done in the adult victims' wells for Lead-214 and for the other thorium products including Actinium.   The trend decreases as the testing proceeds further east, explained by the influence of Palm Beach Aggregates on the M canal and/or the influence of Pratt Whitney on Corbett.

130.   In 2013, Iridium-192 was detected in the Newfield well at 189 ± 22.2 pci/L.  It was detected at the DeCarlo home at 41.2±6.49 pci/L.   In other words, as the groundwater moved southeast away from Corbett, the concentration of this non-naturally occurring radionuclide decreased at the time of testing.

131.   The referenced contaminants were detected in the soil where Newfield, Featherston and DeCarlo systems back-flush.  The half-life of Iridium is 72 days.

132.   The referenced contaminants were found in the water and back-flush soils at the homes of other adult brain tumor victims as well.

133.   The referenced contaminants were detected in the surface water adjacent to the former Cotromano residence 051±.016 pci/L and in the ITID impoundment at 6.115±2.32.   In other words as the surface waters move away from Corbett, the surface water concentration of this non-naturally occurring radionuclide decreased at the time of testing.

134.   The only surface water that did not have radionuclides was the water coming east into the Acreage from outside the L8 basin.

135.   Considering that the half-life of Iridium is 72 days, the quantity of Iridium causing the present contamination would of necessity be dramatically higher the longer the span of time

between the origination of the contamination and the time of testing when the contamination is detected.

136.   Such an exposure greatly increases the risk of developing a brain tumor and was a material and substantially contributing cause of the brain tumor cluster.

137.   The industrial radionuclide Cadmium-109 was also detected in the Newfield back-flush soil.

138.   In 2014, Cadmium-109 in particular was found to be lingering in the pvc piping of Newfield and another adult brain tumor victim's water line moving water from the well to the home.

139.   In addition to the ionizing radiation caused by these radioactive contaminants, cadmium, barium, and lead are neurotoxins which can pass the blood-brain barrier and cause brain tumors.

140.   The accumulated exposure to these metals and to naturally occurring and non-naturally occurring radioactive products leached into the environment by these Defendants was a material and substantially contributing cause of the brain tumor cluster.

141.   The synergistic effect of the exposure to these metals and to naturally occurring and non-naturally occurring radioactive products leached into the environment by these Defendants was a material and substantially contributing cause of the brain tumor cluster.

142.   The cancer cluster caused by these Defendants is a material and substantially contributing cause the damages claimed by Plaintiffs including the brain tumor diagnosis and on-going damages caused thereby.

143.   The pollutive acts discovered in the course of the investigation into the cause of the brain tumor cluster is a material and substantially contributing cause of the brain tumor diagnosis and on-going damages caused thereby.

**THE ACREAGE EXPOSURE MECHANISMS**

144.   The aquifer underneath the Acreage moves at a southeast direction away from the western edge of the Pratt Whitney campus and into the Acreage.

145.   The Aquifer underneath the Acreage is recharged by the M Canal, which has been significantly and periodically influenced by the Aggregates rock pits since at least 2003 and perhaps earlier.

146.   In fact, there is little to no distinction between the surface and ground water in the L8 Basin which includes both the Acreage and the Defendants' business operations.

147.   The described carcinogenic contaminants are present within the L8 Basin as a result of the operations of Pratt Whitney and the Palm Beach Aggregates and were present in the residential water pipes of the brain tumor victims in the pediatric brain cluster due to the significant flood events or recharge events as follows

a.   In the month of December 2001, no less than 650 million gallons of water were drawn down from the Indian Trails Improvement Impoundment into the L8 canal for the purposes of filling the Palm Beach Aggregates rock pits;

b.   Throughout 2003 through 2005, portions of the L8 basin were recharged by discharges from the Palm Beach Aggregates rock pits.

c.   In the months of August and September 2002, the L8 Basin received an accumulation of over 25 inches of rain.

d. In the month of November 2003, the L8 Basin received an accumulation of over 9 inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

e. In the month of September 2004, the L8 Basin received an accumulation of over 20 inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

f. In the month of October 2005, the L8 Basin received an accumulation of over 10 inches of rain, an unseasonal deluge for which the surface water canals structures were unprepared, resulting in flooding in the Acreage and significant recharge of the aquifer.

g. In the month of May 2007, the L8 Basin received an accumulation of over 10 inches of rain.

h. In the month of May 2007, portions of the L8 basin were recharged from releases of the L8 reservoir.

## PRATT WHITNEY LIABILITY

148. Pratt Whitney has used the previously referenced radionuclides, metals including lead, cadmium and barium as well as semi-volatiles and oil-based fuels which could cause benzopyrene contamination in its operations at the Pratt Whitney campus, a campus with numerous canals and sheet-swamps that are adjacent to wetlands in the Corbett Wildlife Management Area (Corbett).

149.    Pratt Whitney used either the specific radionuclides or the parent radionuclide of every naturally occurring radionuclide listed in paragraphs 116-119  in its operations at the Pratt Whitney campus.

150.    In the course of its activities, Pratt Whitney has used radioactive by-product materials and source materials at its Palm Beach Count Campus:

      a.    The licensed use of Nickel 63, Thallium 204, Radium D&E, Promethium 147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt 56, Manganese 54/Cobalt 58, Krypton 85; Cobalt 60, Lead 210 , Rhodium 106, Cobalt 57, Gadolinium, and  Americium241/Strontium90;

      b.    The unlicensed use of Nickel 63, Thallium 204, Radium D&E, Promethium 147, Hydrogen 3, Cadmium 109, Iridium 192, Cesium 137, Strontium 90, Cobalt 56, Manganese 54/Cobalt 58, Krypton 80;

      c.    Source material including the licensed and unlicensed use of thorium dioxide as 2% of thorium-inclusive nickel alloy;

      d.    Source materials including the non-licensed use of thorium-dioxide and other species of concentrated thorium;

      e.    Source materials including the non-licensed use of uranium dioxide and other species of enriched uranium and depleted uranium.

151.    Some of these materials were provided to Pratt Whitney via the United Stated Government either by entrustment for a particular project or via the deed and sale of formerly utilized sites such as the Naval Weapons Reserve Area, also known as the former Air Force Plant 74.

152.    Only some of the licenses for and uses of byproduct and source material by Pratt Whitney were in furtherance of contracts that Pratt Whitney had with the United States Department of Energy and/or Department of Defense.

153.    The wetlands in and around Pratt & Whitney drain into the Acreage surface waters at varying rates each year but particularly in the times of extremely heavy rains such as have been documented to occur at least once every decade from the time Pratt Whitney began working with these materials (circa 1958).

154.    Although Pratt Whitney has received or benefited from funding for clean-up of these and other materials from the United States Army Corp of Engineers and the State of Florida, Pratt Whitney is liable for all contamination at or emanating from its campus.

155.    Pratt Whitney employees worked with fuels including uranium compounds at the Palm Beach County campus in furtherance of both Pratt Whitney proprietary projects and government contract projects.

156.    Pratt Whitney hosted government or other third party projects which worked with fuels including uranium compounds at the Palm Beach County campus.

157.    Nuclear fuels were stored at the Palm Beach County Campus.

158.    The acts described in paragraph 155-157 above occurred, sometimes without regulatory oversight and thus violated all federal regulations related to such activity.

159.    Pratt Whitney has used some or all of these radionuclides in its operations at test stands located on the western edge of the Pratt Whitney campus, a portion of the campus where the groundwater runs southeast at a velocity and trajectory that would carry and has carried contamination into the Acreage community.

160.    In the 1980's, Pratt Whitney reported a portion of the non-radioactive contamination that had built- up over time on its property to the Department of Environmental Regulation.

161.    The site should have been, and was at various times slated to be, an EPA Superfund site, which would have included "a record of decision" and clean-up plan that was authored by, executed by, and performed by EPA.

162.    A Record of Decision (ROD) is a public document that explains which cleanup alternatives will be used to clean up a Superfund site. The ROD for sites listed on the NPL (NPL Site Listing Process) is created from information generated during an EPA conducted Remedial Investigation/Feasibilty Study (RI/FS).

163.    Instead, Pratt Whitney exercised influence through the state agency, the Department of Environmental Regulation, to avoid the sort of government investigation that should have accompanied the preparation of an agency-authored "Record of Decision."

164.    In order to avoid exposure for the full extent of its clean-up liability and to avoid the disclosure of its use of several hazardous and radioactive products, Pratt Whitney exercised influence on the DER through then DER employee Rick Reis to have the clean-up, and more importantly investigation, performed by Pratt Whitney with limited EPA oversight.

165.    Shortly after securing its ability to maintain control over the site, Pratt Whitney hired Rick Reis away from DER to ensure that the company would have minimal exposure.

166.    Pratt Whitney has buried source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burial sites were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains.

167.    Pratt  Whitney has burned hazardous materials as well as  source and by-product materials in unlined shallow burial pits together with other hazardous materials; many of these burn pits were flooded prior to clean-up and caused contamination of the L8 surface and ground water that accumulated and continues to leach into the Acreage surficial aquifer in times of heavy persistent rains.

168.    Pratt Whitney has repeatedly failed to maintain and dispose of source and by-product material in the manner described by federal regulations.

169.    Pratt Whitney mishandled the source material it was licensed to use and thus, violated regulations regarding limiting public exposure.

170.    For example,  Pratt Whitney's disposal of thoriated materials violated  its own internal memoranda the regulations governing its possession of such materials, including that since 1964 Pratt Whitney has falsely reported that it was and would have the materials disposed of by a company licensed to handle such waste.

171.    Since the time of its possession of these materials, Pratt Whitney has failed to use and maintain these materials safely and has emitted these materials into the surface and ground waters in Corbett and into the Acreage as part of routine misuse, dumping and neglect.

172.    Some of that dumping occurred as direct consequence of the fact that Pratt Whitney conducted an internal investigation of the safety of the thorium it was using and concluded that it should no longer be used and should instead be buried.

173.    A significant plurality of the engineers that worked on one of the nuclear source material projects and at least one of the medical officers who studied them died of a brain tumor.

174.    Rather than dispose of the material responsibly, Pratt Whitney buried the materials and brought in a corporate counsel to dissuade the state of any concerns.

175.   Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301-2 because they included unlicensed materials and were used in an unlicensed operation, which is per se violate the entire regulatory regime.

176.   Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1302 because they resulted from the improper storage, use and disposal of such material, as detailed in paragraphs 163-164 and 167.

177.   Those releases violated the applicable standard of care as set forth in the regulations set forth in 10 C.F.R. § 20.1301 because they resulted in doses that exceeded the dose limits for member of the public as set forth in those regulations, as detailed in paragraphs 163-164 and 167.

178.   Emissions of licensed materials which occurred prior to December 3, 1991 included violations of the standard set forth at 10 C.F.R. § 20.1301, dose limits for individual members of the public, because the dose received by the brain tumor victims within the cluster described above exceeded those regulations as a result of exposure to these materials.

179.   The doses exceeded regulation because they were ingested through the water and were absorbed dermally through direct contact with the water.

180.   The doses set forth by 10 CFR § 20.1301 were exceeded as follows:

a.   The dose equivalent to individual members of the public from the licensed operation exceeded 0.1 rem (1 mSv) in a year because the materials, particularly lead 214, cadmium 109 and iridium 192 escape any sediment filters customarily used by the families residing in the Acreage, causing an accumulation of such material in the piping of the residential water supply, causing an ambient dose that exceed .1 rem per year; and

b.  Upon certain flood events as described above, the dose exceeded .002 rem in an hour; and,

c.  Any appreciable dose exceeded the regulations because Pratt Whitney did not have a permit to release the radioactive materials into the public sewer system into its deep injection well, and into the waters of the L8 reservoir.

181.  Those emissions which occurred subsequent to 1991 or continued to accrue in measurable dose after December 3, 1991 included violations of both 10 C.F.R. § 20.1301 as well as 20.1302 because Pratt Whitney failed to perform any surveys as required in 20.1301(a) or to measure or reduce the rate as required in 20.13029(b) or (c).

182.  Those emissions which occurred subsequent to 1991 also included violations of the "As Low as is Reasonably Achievable" standard set forth in the "Offsite Dose Calculation Manual" published by the Nuclear Regulatory Commission, because the Defendant failed to make any reasonable attempts to keep such doses from occurring for several years while the contaminants were leaching into the L8 surface and ground water.

183.  As it relates to hazardous materials and metals only, Pratt Whitney, since the mid 1980's, has been subject to certain requirements pursuant to its RCRA licenses as defined above and has failed to meet its obligations because it delayed clean-up, conducted biased risk assessments, and failed to post notice as required in the library located within the Acreage.

## PALM BEACH AGGREGATES' LIABILITY

184.  Palm Beach Aggregates and/or its predecessor in interest, GKK Aggregates, have conducted an aggregate mining business to the west of the Acreage since at least 1993.

185.    The aggregate mined by Palm Beach Aggregates is of particular value because it consists of limestone rock, the density of which is sufficient to meet the criteria for road and highway construction.

186.    Until 2008, the mining included a dewatering or dredging process through which Palm Beach Aggregates at various times deposited waters including high-concentrations of Technologically Enhanced Naturally Occurring Radioactive Materials (TE-NORM) into adjacent surface waters.   These materials are not included within the statutory definition of Source Material or By-Product material as found in Price-Anderson at 42 USC 2014 and are in fact exempted by those definitions.

187.    At times prior to 2003, the dewatering violated permits either because the water emitted was in excess of the volume permitted or the water was deposited into non-permitted recipient water bodies, such as the L8 Canal.

188.    In 2003, Palm Beach Aggregates entered into a Consent Final Judgment with South Florida Water Management District (SFWMD) through which many of the pits Palm Beach Aggregates was in the process of mining or had already mined were condemned to SFWMD for use as a reservoir.

189.    For some time prior to this condemnation, Palm Beach Aggregates had been negotiating with other prospective buyers.   The deal struck with SFWMD was for over two hundred million dollars.

190.    The    first    condemnation    was    of    parcels    00404317000001030, 00404320000001040, which included many of the pits Palm Beach Aggregates had already mined.    In February and August of 2007, Palm Beach Aggregates conveyed parcels

00404329000005010 and 00404320000001010 to the District as well. These additional conveyances were performed in accordance with the 2003 Consent Judgment.

191.     According to the 2003 Consent Judgment, Palm Beach Aggregates retained a reservation of Occupancy, Possession, and Use, which allowed them continue to excavate or dredge pits. Palm Beach Aggregates also reclaimed pits for reservoir use, or constructed the reservoir. The Consent agreement also required Palm Beach Aggregates to certify the cells for water storage use before turning them over to SFWMD for use as a reservoir.

192.     Pursuant to the Consent Judgment, Palm Beach Aggregates retained control of the pits and specifically provided indemnity for any pollution caused by the pits for some time until the process of handing over the pits was complete, which was not until sometime after May 2009.

193.     Palm Beach Aggregates continued its mining activities at parcels it still owned around the Reservoir including 00404329000005020 and   00404329000003020.

194.     From   2003   until   September   2008,   the   Aggregates   continued   the dewatering/dredging process through which technologically enhanced NORM (TE-NORM) was increased in the designated reservoir pits.

195.     Before 2003, the recognition that Palm Beach Aggregates operations had caused or may have caused and would continue to cause contamination within the waters of the pits and the adjacent canals within the Acreage was known by Palm Beach Aggregates and its consultants.

196.     The discovery of Palm Beach Aggregates' responsibility for contamination of the Acreage has been hindered by inconsistent and inaccurate reporting to state regulatory agencies by Palm Beach Aggregates.

197. TE-NORM has from time to time at various times escaped the confinement of the pits and has entered adjacent canals flowing into the Acreage, contaminating both surface and subsurface waters within the Acreage and materially contributing to the increased incident of brain cancers in the Acreage.

<u>COUNT I</u>
<u>PRICE-ANDERSON CLAIM AGAINST DEFENDANT PRATT WHITNEY</u>

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 6 regarding jurisdiction and citizenship; 7 through 20 regarding Plaintiff's diagnosis; 21-31 regarding the Brain Tumor Cluster; 32-116 regarding the Failed State Study into the Cause; Paragraphs 116-122 regarding the Radiation in the Acreage Generally, 124-143 regarding the investigation by the Families and Particular Radionuclides Found, paragraphs 144-147 regarding exposure mechanisms, paragraphs 148-182 regarding Pratt Whitney liability.

198. In addition to the allegations regarding the 2013 detection of industrial radionuclides, alleged in the incorporated paragraphs 124-143 regarding the widespread presence of radiation in the Acreage, the following is noted regarding the WISE property on 57th Place North and the testing of brain tumor victims living within the lower m1 impoundment:

    a. In August 2013 samples had been drawn from the home of a 2010 diagnosed glioblastoma victim, Debra Craig, who lives a mile west of Plaintiffs on 56th Place. Those samples included the following radionuclides:

        i. In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the Craig's well at the level of $378.770 \pm 47.259$ pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead -214 was found in the water drawn from the Craig's well at the level of 386.710 ± 46.904 pci/L.

b.  In a November 2013 samples had been drawn from the home of a 2011 diagnosed glioblastoma victim who lives a mile west of Craig (two miles west of the Plaintiffs) on 54th Place.  Those samples included the following radionuclides:

      i.  In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the Craig's well at the level of 22.935 ± 7.442 pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead -214 was found in the water drawn from the 54th place residence at the level of 27.672 ± 9.479 pci/L.

c.  In a January 2014 samples had been drawn from the home of a 2009 diagnosed glioblastoma victim who lives 580 yards south of Wise on 54th Road.  Those samples included the following radionuclides:

      i.  In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the 54th Rd. location at the level of 93.428 ± 16.649 pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead-214 was found in the water drawn from the 54th Rd. location at the level of 131.930 ± 32.060 pci/L.

d.  In a December 2013 sampling event at the WISE home, samples were drawn from a well drilled earlier that year and no radionuclides were detected in the water.

e.  During the December 2013 sampling event described in c above, soil samples were also taken from the area where the water systems attached to the old and the new would deposit back-flush water, those samples included the following radionuclides

    i.  Bismuth-214 was found at the level of 2.470 ± 0.439 pci/g;

    ii. Lead-214 was at the level of 2.844 ± 0.458 pci/g.

f.  During the December 2013 sampling event described in a above, water samples were taken from the canal adjacent to the property, fished by RONALD as a child, and the following radionuclides were detected:

    i.   Bismuth-214 was found at the level of 25.964 ± 13.641 pci/L;

    ii.  Lead-214 was found at the level of 41.845 ± 12.983 pci/L;

    iii. Uranium-238 was found at the level of 1.43 ± 0.650 pci/L.

g.  In January 2014, the former well (prior to 2013) was purged and tested.  Prior to being purged, a water sample was collected and the following radionuclides were detected:

    i.   Bismuth-214 was found at the level of 347.640 ± 43.388 pci/L;

    ii.  Lead-214 was found at the level of 347.430 ± 42.244 pci/L;

    iii. Uranium-234 was found at the level of 1.76 ± 0.394 pci/L;

    iv.  Uranium-234 was found at the level of 2.03 ± 0.394 pci/L; and

    v.   Cadmium-109 was found at the level of 438.630 ± 196.970 pci/L.

36

h. In the January 2014 sampling event described above, a water sample was collected after the well was purged and the following radionuclides were detected:

  i. Bismuth-214 was found at the level of 74.306 ± 13.941 pci/L;

  ii. Lead-214 was found at the level of 99.676 ± 16.469 pci/L;

  iii. Uranium-234 was found at the level of 1.46 ± 0.301 pci/L;

  iv. Uranium-238 was found at the level of 1.29 ± 0.276 pci/L.

i. In the January 2014 sampling event described above, a section of the pvc pipe which carried the water from the well to the prior water treatment system was collected for testing the pipe sediment. The following radionuclides were detected:

  i. Actinium-228 was found at the level of 8.868 ± 1.496 pci/g;

  ii. Bismuth-214 was found at the level of 40.102 ± 4.421 pci/g;

  iii. Lead-214 was found at the level of 45.167 ± 4.950 pci/g;

  iv. Uranium-234 was found at the level of 0.693 ± 0.161 pci/g;

  v. Uranium-238 was found at the level of 0.510 ± 0.127 pci/g; and

  vi. Cadmium 109 was found at the level of 50.651 ± 6.647 pci/g.

199. Pratt Whitney owed a duty of care to the surrounding neighborhoods to exercise caution and to follow the dictates of Price-Anderson and all applicable regulations promulgated under that statute including but not limited to 10 CFR § 20.1301 in its use of source and by-product materials.

200.   Defendant Pratt Whitney owed a duty of care to the surrounding neighborhoods and to its inhabitants such as the Wises to exercise caution and to be licensed to use any source or by-product materials.

201.   Defendant breached those duties as described above by acts including but not limited to the unpermitted use of, burial of, burning of, and dumping of source and by product material.

202.   At times, Defendant Pratt Whitney has realized a portion of the damages caused by its neglect but instead of remediating the problem, it allowed its property to continue such emissions by failing to remediate contamination safely.

203.   Defendant's failures caused the materials to be leached or emitted into the ground water and surface waters adjacent to their properties and eventually into the Acreage community, directly causing the presence of the contaminants detailed above in paragraph 198.

204.   These breaches caused the Wises to be significantly exposed to radioactive materials in an amount exceeding the levels set by 10 CFR §20.1301 as set forth in paragraph 181.

205.   These breaches included violations of applicable federal regulations as detailed in 176-183.

206.   These breaches, particularly including the acts described in paragraphs 158-174, include reckless, knowing disregard of the safety of the neighboring communities as evidenced by the fact that in 1964 Pratt Whitney acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials.

207.    The breaches described in this Count and the incorporated paragraphs caused the Wises' damages including but not limited to the economic damages, mental anguish, pain and suffering, loss of enjoyment of life, diminished capacity, disfigurement caused by his affliction of radiation-induced illness, visual impairment and brain tumor.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, punitive damages, costs of litigation and such other and further relief as the Court may deem appropriate. Plaintiffs further demand trial by jury.

## COUNT TWO
## Negligence—Pratt Whitney

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 6 regarding jurisdiction and citizenship; 7 through 20 regarding Plaintiff's diagnosis; 21-31 regarding the Brain Tumor Cluster; 32-116 regarding the Failed State Study into the Cause; Paragraph 123 regarding Semi-volatiles and Metals Generally, paragraphs 144-147 regarding exposure mechanisms, and paragraphs 148, 156-163 and 183 regarding Pratt Whitney liability.

208.    In addition to the allegations incorporated in paragraph 123 regarding the widespread presence of metals and semi-volatiles in the Acreage, WISE recreated in and around the Corbett area for decades as a child and young man; he was exposed to the wildlife via ingestion and to the water and air via inhalation and dermal exposure from fishing and recreating the canals and swamps the border the Pratt Whitney campus.

209.    Pratt Whitney owed the surrounding community, including the Wises, the duty to exercise at least reasonable care in its efforts to use of non-radioactive hazardous materials (such as jet fuel) and metals including cadmium, barium, and lead in a safe manner commencing with its opening in 1955 continuing at all times thereafter.

210.    Instead, Pratt Whitney dumped, burned and piped these materials in a manner that caused the presence of these metals and benzopyrene to be present in the Acreage.

211.    From 1957 through 2009, and perhaps even until today, Defendant Pratt Whitney has breached that duty by allowing the soils and waters of its operations to become contaminated and to emanate these hazardous materials and metals.

212.    As controller and operator of its facilities and as landowner, Pratt Whitney is jointly and severally liable together with any prior or subsequent non-innocent landowner of its properties as well any other tort-feasor for any damages resulting from these pollutive acts.

213.    The breaches described above caused the RONALD's tumor and the Wises' damages including but not limited to the economic damages, mental anguish, pain and suffering, loss of enjoyment of life, diminished capacity, disfigurement, visual impairment and brain tumor. These damages are ongoing and continuing in nature.

214.    These breaches, particularly including the acts described in paragraphs 160-165, include reckless, knowing disregard of the safety of the neighboring communities as evidenced by the fact that in 1964 Pratt Whitney acknowledged the danger related to these materials, the need to use and dispose of them with paramount caution and then for decades failed to use any such caution and purposely buried the materials.

WHEREFORE, Plaintiffs demand judgment for damages, interest, costs of litigation and such other and further relief as the Court may deem appropriate.   Plaintiffs further demand trial

by jury.  Plaintiffs reserve the right to assert a claim for punitive damages upon satisfaction of statutory prerequisites.

## COUNT THREE
### Negligence-Palm Beach Aggregates

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 6 regarding jurisdiction and citizenship; 7 through 20   regarding Plaintiff's diagnosis; 21-31 regarding the Brain Tumor Cluster; 32-116 regarding the Failed State Study into the Cause; Paragraphs 116-119 and 121-123 regarding Radiation in the Acreage Generally; paragraphs 124-129 regarding radium decay products; paragraphs 144-147 regarding exposure mechanisms; and paragraphs 184-197 regarding the Aggregates Liability.

215.    In addition to the allegations in paragraphs 121-123 regarding Radiation in Acreage Generally and paragraphs 124-129 regarding radium decay products, the following radionuclides (which may have resulted as decay products within the limestone quarried by the Defendant Aggregates)  are noted regarding the regarding the WISE property on 57th  Place North and the testing of brain tumor victims living within the lower M1 impoundment::

    a.  In August 2013 samples had been drawn from the home of a 2010 diagnosed glioblastoma victim, Debra Craig, who lives a mile west of Plaintiffs on 56th Place.  Those samples included the following radionuclides:

        i.  In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the Craig's well at the level of $378.770 \pm 47.259$ pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead -214 was found in the water drawn from the Craig's well at the level of 386.710 ± 46.904 pci/L.

b.  In a November 2013 samples had been drawn from the home of a 2011 diagnosed glioblastoma victim who lives a mile west of Craig (two miles west of the Plaintiffs) on 54th Place.  Those samples included the following radionuclides:

      i.  In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the Craig's well at the level of 22.935 ± 7.442 pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead -214 was found in the water drawn from the 54th place residence at the level of 27.672 ± 9.479 pci/L.

c.  In a January 2014 samples had been drawn from the home of a 2009 diagnosed glioblastoma victim who lives 580 yards south of Wise on 54th Road.  Those samples included the following radionuclides:

      i.  In the samples from the August 2013 sampling event, Bismuth-214 was found in the water drawn from the 54th Rd. location at the level of 93.428 ± 16.649 pci/L.

      ii.  In the samples from the August 2013 sampling event, Lead-214 was found in the water drawn from the 54th Rd. location at the level of 131.930 ± 32.060 pci/L.

d.  In a December 2013 sampling event at the WISE home, samples were drawn from a well drilled earlier that year and no radionuclides were detected in the water.

e.  During the December 2013 sampling event described in c above, soil samples were also taken from the area where the water systems attached to the old and the new would deposit back-flush water, those samples included the following radionuclides

   i.  Bismuth-214 was found at the level of 2.470 ± 0.439 pci/g;

   ii.  Lead-214 was at the level of 2.844 ± 0.458 pci/g.

f.  During the December 2013 sampling event described in a above, water samples were taken from the canal adjacent to the property, fished by RONALD as a child and the following radionuclides were detected:

   i.  Bismuth-214 was found at the level of 25.964 ± 13.641 pci/L;

   ii.  Lead-214 was found at the level of 41.845 ± 12.983 pci/L.

g.  In January 2014, the former well (prior to 2013) was purged and tested.  Prior to being purged, a water sample was collected and the following radionuclides were detected:

   i.  Bismuth-214 was found at the level of 347.640 ± 43.388 pci/L;

   ii.  Lead-214 was found at the level of 347.430 ± 42.244 pci/L;

h.  In the January 2014 sampling event described above,  a water sample was collected after the well was purged and the following radionuclides were detected:

   i.  Bismuth-214 was found at the level of 74.306 ± 13.941 pci/L;

      ii.   Lead-214 was found at the level of 99.676 ± 16.469 pci/L.

i.   In the January 2014 sampling event described above, a section of the pvc pipe which carried the water from the well to the prior water treatment system was collected for testing the pipe sediment. The following radionuclides were detected:

      i.   Bismuth-214 was found at the level of 40.102 ± 4.421 pci/g;

      ii.   Lead-214 was found at the level of 45.167 ± 4.950 pci/g;

216.   From at least 1993 through 2003, Defendant Palm Beach Aggregates and/or its predecessor companies has breached that duty by allowing the soils and waters of its operations to become contaminated and to emanate contaminations in the form of mining tailings including enhanced levels of radium decay products into the surface and groundwater of the L8 basin.

217.   Defendant Palm Beach Aggregates owed a duty of care to the surrounding neighborhoods and to tis inhabitants such as the Plaintiffs to exercise caution in its large scale mining operations and the construction of the L8 reservoir.

218.   Defendant Palm Beach Aggregates has further breached that duty by failing to exercise reasonable care when it lobbied for and then built the reservoir project that would exacerbate the problem.

219.   The breaches described caused the RONALD's tumor and the Wises' damages including but not limited to the economic damages, mental anguish, pain and suffering, loss of enjoyment of life, diminished capacity, disfigurement, caused by his affliction of radiation-induced illness, visual impairment and brain tumor.

WHEREFORE, Plaintiffs demand judgment for damages, interest, costs of litigation and such other and further relief as the Court may deem appropriate.   Plaintiffs further demand trial by jury.

## COUNT FOUR
## TRESPASS AGAINST PALM BEACH AGGREGATES AND PRATT WHITNEY FOR NON-SOURCE AND NON-BYPRODUCT MATERIALS

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 6 regarding jurisdiction and citizenship; 7 through 20  regarding Plaintiff's diagnosis; 21-31 regarding the Brain Tumor Cluster; 32-116 regarding the Failed State Study into the Cause; Paragraphs 116-119 and 121-123 regarding Radiation in the Acreage Generally; paragraphs 124-129 regarding radium decay products; paragraphs 144-147 regarding exposure mechanisms; paragraphs 148, 156-163 and 183 regarding Pratt Whitney liability; and paragraphs 184-197 regarding the Aggregates Liability.

220.    From 2003 through and including at least 2009, Defendants allowed pollution to trespass unto the property and persons of the Wises as described in the allegations above.

221.    Defendants are strictly and jointly liable for damages resulting from trespass.

222.    The trespasses alleged caused the Plaintiffs' damages including but not limited to the economic damages, mental anguish, pain and suffering, loss of enjoyment of life, diminished capacity, disfigurement caused by his affliction of radiation-induced illness, visual impairment and brain tumor.  These damages are ongoing and continuing in nature.

WHEREFORE, Plaintiffs demand judgment for damages, interest, costs of litigation and such other and further relief as the Court may deem appropriate.   Plaintiffs further demand trial by jury.

## COUNT FIVE
## CHAPTER 376 LIABILITY AGAINST PALM BEACH AGGREGATES
## AND PRATT WHITNEY

Plaintiffs re-allege those facts and matters set forth in the allegations above as stated in the paragraphs 1 through 6 regarding jurisdiction and citizenship; 7 through 20  regarding Plaintiff's diagnosis; 21-31 regarding the Brain Tumor Cluster; 32-116 regarding the Failed State Study into the Cause; Paragraphs 116-119 and 121-123 regarding Radiation in the Acreage Generally; paragraphs 124-129 regarding radium decay products; paragraphs 144-147 regarding exposure mechanisms; paragraphs 148, 156-163 and 183  regarding Pratt Whitney liability; and paragraphs 184-197 regarding the Aggregates Liability.  As alleged above, both Palm Beach Aggregates and Pratt Whitney emitted contaminants into the surface and groundwater in excess of the limits allowed by governing agencies, statutes and, when applicable, their permits.

223.    Pursuant to F.S. §376.313, Pratt Whitney and Palm Beach Aggregates are strictly and jointly liable for any and all damages emanating from the effluences described in incorporated  above to the extent they include materials not defined as either source of by-product materials under 42 USC 2014.

224.    The emissions caused the Wises' damages including but not limited to the economic damages, mental anguish, pain and suffering, loss of enjoyment of life, diminished capacity, disfigurement caused by his affliction of radiation-induced illness, visual impairment and brain tumor. These damages are ongoing and continuing in nature.

225.    Pursuant to that Act, Plaintiffs may be awarded costs of litigation (including reasonable attorney's and expert fees) if the court determines such an award is in the public interest.

WHEREFORE, Plaintiffs demand judgment for damages, interest, costs of litigation, an award for attorney fees and costs pursuant to F.S. §376.313 and further demand trial by jury.

## COUNT VI
## LOSS OF CONSORTIUM AGAINST DEFENDANTS

226.    Plaintiff AMANDA WISE re-alleges paragraphs 1 through 6 above as if fully set forth herein.

227.    AMANDA WISE and RONALD G. WISE, JR. have lived together as husband and wife since 2004.

228.    AMANDA WISE is, and at all material times has been, the wife of RONALD G. WISE, JR.

229.    As a result of the negligence of Defendants, Plaintiff AMANDA WISE has been in the past, and will be in the future, deprived of the comforts, society, companionship, support, and consortium of Plaintiff RONALD G. WISE, JR.

WHEREFORE, Plaintiff AMANDA WISE demands judgment against Defendants for compensatory damages, prejudgment interest, and costs, and such further relief as may be just.

Dated: May 19, 2014

/s/ Mara R. P. Hatfield
MARA RITCHIE PONCY HATFIELD
Florida Bar No. 37053
JACK SCAROLA
Florida Bar No: 169440
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL  33409
Phone:  (561)686-6300
Fax:  (561) 383-9451
Email: dtm@searcylaw.com